# EXHIBIT 1

**Execution Version**

# LIMITED SOFTWARE LICENSE AGREEMENT

**This LIMITED SOFTWARE LICENSE AGREEMENT** (this "Agreement") is dated as of March 29, 2019 (the "Effective Date") by and between NCS Pearson, Inc., a Minnesota corporation (the "Licensor") and Pearson K12 Learning LLC, a Delaware limited liability company (the "Licensee"). Licensor and Licensee are referred to herein collectively as the "Parties" and individually as a "Party". Capitalized terms used and not otherwise defined herein shall have the meanings given to them in that certain Purchase Agreement dated as of February 16, 2019 by and between the Licensor, Trio Holdings LLC and Gateway Education LLC, a Delaware limited liability company ("Purchaser") (the "Purchase Agreement").

WHEREAS, in connection with the sale of the Business to Purchaser pursuant to the Purchase Agreement, the Licensor agreed to license to Licensee the software (in object and source code form) and related documentation set forth on Exhibit A (the "Software"); and

WHEREAS, the Licensee desires to receive a non-exclusive license to the Software for use in the operation of the Business, and the Licensor is willing to grant such non-exclusive license to the Licensee under the terms and conditions provided herein.

NOW, THEREFORE, in consideration of the promises and of the mutual agreements and covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

Article I
LICENSE

1.1   Grant of License to Software. Subject to all of the terms and conditions of this Agreement, the Licensor on behalf of itself and its Affiliates, hereby grants to the Licensee, and the Licensee accepts, a limited, non-exclusive, non-transferable (except as set forth in Section 7.5), non-sublicensable (except as permitted below), worldwide right and license during the Term of this Agreement to use, copy, download, perform, display, transmit, modify, improve, enhance, translate, and create derivative works of the Software solely in connection with products and services of the Business specified in Exhibit A (the "Platforms") in the United States of America, Puerto Rico and other U.S. territories. The rights and licenses granted to Licensee under this Section include the rights to:

(i)   sublicense the Software to End Users (as defined in and subject to the terms of Section 2.3 below) in connection with the Platforms in the pre-K-12 market in the United States, Puerto Rico, and other U.S. possessions;

(ii)   host and make the Software accessible to End Users in connection with the Platforms;

(iii)   distribute the Software to third-party contractors who are involved in the distribution, marketing or support of the Licensee's products (the "Licensee's Contractors");

(iv)     use and copy the Software in connection with distributing and marketing the Software and supporting the use of the Software by End Users;

(v)     reproduce, use, display, distribute and create derivative works of the Software, related documentation and training materials; and

(vi)     allow the Licensee's Contractors to do any of the foregoing solely in support of the distribution, marketing, or support of the Software by the Licensee.

For the avoidance of doubt, Licensee shall not, under any circumstances (including on a standalone basis), use, copy, distribute, or sublicense the Software apart from the Platforms (or updated versions thereof that do not materially change the purpose or intended audience of such Platforms) in which such Software is embedded as of the Effective Date.

1.2     Ownership. All ownership rights in the Software, software specifications, software code and all related documentation shall be retained and held solely by the Licensor. Licensee shall not in any way attempt to establish any ownership rights therein. The Licensor will own all modifications, improvements and derivative works of the Software (other than Content as defined below) created by or on behalf of Licensee or its Licensee Contractors pursuant to the license set forth in Section 1.1 (collectively, "Improvements").  Licensee hereby assigns and agrees to assign (and to cause its contractors, including Licensee Contractors, to assign) to Licensor, all right, title and interest (including all Intellectual Property rights) in and to the Improvements and, following such assignment, such Improvements shall be considered Software for purposes of this Agreement.

1.3     Rights in Bankruptcy. For the avoidance of doubt, the licenses granted in Section 1.1 are licenses of intellectual property rights as contemplated by Section 365(n) of the United States Bankruptcy Code.

1.4     Branding. This Agreement contains no trademark license express or implied from either Party. The Licensee may affix and imprint its own notices, phrases, tradenames, marks, logos, titles or designations: (a) to any of the training materials and documentation (including derivative works thereof); (b) to packaging and media of its software in which the Software is incorporated, and documentation and training materials; and (c) within the Software as necessary to incorporate and identify the Licensee's software products, notices, phrases, trade names, marks, logos, titles or designations; provided, however, that the Licensor's copyright notice for the Software shall be included in an "About" box or similar acknowledgments, and attributions for the Licensor's ownership of the Software will be included in the literature distributed to End Users by the Licensee in connection with its sublicensing, distribution and marketing of the Software. The Licensee shall use the following copyright notice and attribution of the Licensor in connection with its foregoing obligations referencing the applicable entity as designated by Licensor: © Copyright © 201[•] NCS Pearson, Inc. All rights reserved. (or substantially similar notice and attribution language in a form and format reasonably acceptable to the Licensor). The Licensee shall not otherwise knowingly imply that the Licensee is the owner or creator of the Software.

1.5     No Other Licenses. The Licensor grants no licenses or other rights to the Licensee with respect to the Software except for those licenses expressly set forth herein. The license granted hereunder does not include the right to or permit, and Licensee shall not:

(i)     use the Software (a) in connection with any products or services other than the Platforms offered in connection with the Business in the pre-K-12 market as of the Effective Date;

(ii)    sell or license the Software as a commercial offering or distribute it any other manner not expressly permitted herein; or

(iii)   provide the Software as a standalone software-as-a-service (SaaS) product to any third party, including as a standalone assessment product;

except, in the case of subparts (ii) and (iii), to the extent the Software was imbedded in, or is required for the operation of a commercial offering or SaaS product provided by Licensee as of the Effective Date. The licenses granted herein are revocable upon termination of this by the Licensor pursuant to Section 3.1 in the event of a material uncured breach of the terms of this Agreement.

1.6     Maintenance; Comingled Software. In the event that either Party reasonably suspects that there has been a successful security breach or identifies a critical security issue with respect to the Software or otherwise becomes aware of a source code release or other breach related to or exploiting the Software, it shall promptly notify the other Party of such issue.  In the event that either Party creates a patch, update, or other fix to address such issue (a "Fix"), such Party shall promptly notify the other Party of such Fix and shall share such Fix with the other Party upon written request.  For the avoidance of doubt, absent mutual written agreement by the Parties, the Party preparing the Fix shall not be obligated to provide support for such Fix to ensure it is usable by the other Party.  Costs associated with any updates made upon mutual written agreement by the Parties pursuant to the preceding sentence shall be reimbursed on a time and materials basis by the non-updating Party.  Licensor shall have no other obligation to Licensee or any third party to update, support or maintain the Software.  In the event Licensor unintentionally provides software, commingled or otherwise, with the Software, that is not necessary to operate the Software, the Parties will work together in good faith to have any such additional software returned or destroyed, or, if return or destruction is not commercially practicable, then Licensee will use commercially reasonable efforts to attempt to remove such additional software and will covenant not to use or distribute such additional software in any commercial manner, as Licensor may reasonably request and Licensee will have no license rights under this Agreement with respect thereto.

Article II
SOFTWARE OWNERSHIP AND PROTECTION

2.1     Confidentiality and Protection. The Licensee acknowledges that the Licensor retains ownership of all rights in the Software and Improvements, and claims and maintains at all times proprietary copyright, patent and trade secret rights in the Software, Improvements, and Software and Improvement code (including source code). The Licensee agrees to reasonably

cooperate with the Licensor in protecting its rights in the Software and in preserving appropriate Intellectual Property rights protection for the Software. Without limiting the generality of the foregoing, the Licensee shall, and shall use commercially reasonable efforts to cause the Licensee's Contractors or other third parties acting on the Licensee's behalf to: (i) prevent the Software and Improvements from becoming subject to open source licenses that preclude the imposition of further restrictions on copying, modifying, or redistributing materials subject to their terms; (ii) treat the source code for the Software and Improvements as strictly confidential; (iii) take commercially reasonable measures to prevent and protect the Software and Improvements from unauthorized use or disclosure; and (iv) not use such source code or any other trade secrets of the Licensor except as reasonably necessary to exercise the Licensee's rights and perform its obligations under this Agreement. Except as expressly granted in this Agreement, nothing contained in this Agreement will be construed as conferring any rights by implication, estoppel or otherwise, and all rights not expressly granted under this Agreement are expressly reserved.

2.2     No Transfer. The Licensee agrees not to sell, transfer, sublicense, disclose, display, or otherwise make available the Software, Improvements, or any known, unintentionally commingled software described in Section 1.5, except as expressly set forth in Section 1.1 or Section 7.5. The Licensee agrees that any attempts by the Licensee to establish any rights in the Software (except for those provided herein) and/or failure to materially comply with the obligations of Section 2.1 shall constitute a material breach of this Agreement giving rise to the Licensor's right to revoke/terminate the licenses granted herein and to seek other remedies pursuant to Section 3.1.

2.3     End User Licenses. As used herein, "End Users" shall mean collectively, any and all entities or persons that license the Software from the Licensee (or its designee). All use and distribution of End User licenses for the Software shall be subject to a written (or electronic, e.g., "click-wrap") software license agreement containing terms and conditions with protections and limitations at least equal to the protections and limitations that the Licensee uses with its proprietary software when licensed to the Licensee's customers, which shall include, at a minimum, the following concepts:

(i)     The Licensor shall have not have any liability of any kind whatsoever to any End Users, including any damages, whether direct, indirect, incidental, or consequential, arising from an End User's use of the Software (including Improvements embedded therein) and/or Software documentation.

(ii)    The End User license agreement for the Software is between the End User and the Licensee (and not with the Licensor).

(iii)   The Licensee is solely responsible for providing maintenance and support for the Software. The Licensor shall not have any performance obligation whatsoever directly to any End Users.

(iv)    The Licensee is solely responsible for any Software warranties provided by Licensee to the End User, whether express or implied by Law, and any claims, losses,

liabilities, damages, costs or expenses attributable to any failure of the Software to conform to any such warranties are the Licensee's sole responsibility.

2.4     Not Unauthorized Use.  Other than as expressly authorized herein, Licensee shall not use, disclose, make or have made any copies of the Software, and shall take reasonable measures to prevent any of its contractors (including Licensee Contractors), End Users or any other party from making copies of the Software, in whole or in part, without the prior written authorization of Licensor.

Article III
TERM; REMEDIES FOR BREACH; RENEWAL FEES

3.1     Term.  This Agreement will take effect upon the Effective Date and remain in effect until January 1, 2025 ("Initial Term"), unless earlier terminated in accordance with this Section 3.1  Following expiration of the Initial Term, the term shall automatically renew for up to four (4) additional one-year terms (each, a "Renewal Term") unless Licensee provides Licensor with written notice of non-renewal prior to the end of the Initial Term or the then-current Renewal Term (the Renewal Terms, together with the Initial Term, the "Term"). In the event of a material breach of this Agreement by the Licensee, the Licensor may file for an injunction or other equitable relief (which, for the avoidance of doubt, may include termination, revocation, rescission or other cancellation or voiding of this Agreement in whole or in part) without the necessity of proving actual damages, or posting a bond or other security. Further, nothing herein shall be construed to limit the Licensor's right to seek and recover damages and other remedies (other than termination) in connection with the Licensee's breach or alleged breach of this Agreement.

3.2     Renewal Fees.  No fees shall be owed under this Agreement during the Initial Term of this Agreement. For any Renewal Term, Licensee shall pay to Licensor a license fee for such Renewal Term as set forth below (the "Renewal Fees"):

        (i)     for each of the first and second Renewal Terms (i.e., the seventh and eighth years of the Term), two hundred and fifty thousand dollars ($250,000);

        (ii)    for the third Renewal Term (i.e., the ninth year of the Term), three hundred and fifty thousand dollars ($350,000); and

        (iii)   for the fourth Renewal Term (i.e., the tenth year of the Term), five hundred thousand dollars ($500,000).

3.3     Payment Terms.  Payment of Renewal Fees by Licensee is subject to any termination (i.e., pro-rated for any partial year) pursuant to Section 3.1, due and payable following an invoice from Licensor issued to Licensee at the beginning of the applicable Renewal Term. Licensee shall pay all undisputed amounts for such license fees within sixty (60) days after Licensee's receipt of such invoice.

3.4     Effects of Termination.  In the event that this Agreement expires or is earlier terminated, Licensee shall promptly destroy all copies of the Software, except that Licensee may

retain one copy of the Software for archival non-production purposes.  An officer of Licensee shall certify such destruction in writing and provide such written certification to Licensor within thirty (30) days following the expiration or termination of this Agreement.  In the event of the expiration or earlier termination of this Agreement for any reason, the Parties' rights and obligations pursuant to Section 1.2, Section 3.4, Article 4, Article 5, Article 6, and Article 7 hereof (and any other provision which by its terms is intended to survive the Term of this Agreement, as may be extended by the Parties), shall survive the expiration or earlier termination of this Agreement for any reason whatsoever, and any breach or default by any Party hereto prior to or resulting from such expiration or termination, and the other Party's rights with respect thereto, shall survive such expiration or termination.

Article IV

REPRESENTATIONS AND WARRANTIES

4.1     Mutual Warranties. Each Party represents and warrants that such Party: (i) is duly incorporated, organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation and has the corporate, company, or partnership power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby; (ii) has the necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and (iii) the execution, delivery and performance of this Agreement by such Party has been duly authorized by all necessary corporate, company or partnership action of such Party.

4.2     Disclaimer of Warranties. EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE IV OR IN THE PURCHASE AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE SOFTWARE, AND ANY AND ALL RELATED DOCUMENTATION AND MATERIALS ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTY OF ANY KIND, AND EACH PARTY DISCLAIMS ALL WARRANTIES NOT EXPRESSLY SET FORTH THEREIN OR HEREIN, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY ARISING BY STATUTE OR OTHERWISE IN LAW, OR FROM A COURSE OF DEALING OR USAGE OF TRADE.

Article V

INDEMNITY; LIMITATIONS OF LIABILITY

5.1     Indemnification by Licensee. Licensee shall defend, indemnify, and hold harmless the Licensor, its Affiliates, and each of their directors, officers, employees, agents, attorneys, representatives, successors and permitted assigns ("Licensor Indemnified Party") from and against any and all losses, liabilities, damages, actions, suits, demands or claims (including amounts paid in settlement and reasonable costs of investigation and reasonable attorneys' fees and disbursements) arising out of or resulting from third-party claims (collectively "Claims") made against any Licensor Indemnified Party relating to or arising out of: (i) a breach by Licensee of any agreements, covenants, representations and warranties made in this Agreement; (ii) the gross negligence or willful misconduct of any Licensee Indemnified Party in connection with this Agreement; (iii) any End User Claim in connection with such End User's use of the

Software or Improvements; or (iv) any claim alleging that the Improvements infringe, misappropriate, or otherwise violate the Intellectual Property rights of any third party.  Neither Party shall agree to any settlement of a Claim without the consent of the other Party, which consent shall not be unreasonably withheld or delayed and any such settlement shall contain an unconditional release of both the Licensor Indemnified Parties and the Licensee Indemnified Parties.

5.2     Indemnification by Licensor. Licensor shall defend, indemnify and hold Licensee and its Representatives (each a "Licensee Indemnified Party"), harmless from and against any and all Claims made against any Licensee Indemnified Party relating to or arising out of: (i) a breach by Licensee of any agreements, covenants, representations and warranties made in this Agreement; (ii) the gross negligence or willful misconduct of any Licensor Indemnified Party in connection with this Agreement; (iii) any claim alleging that the Software (as it exists as of the Effective Date) or any modifications, adaptations, translations, improvements and derivative works of the Software created by or on behalf of Licensor infringe, misappropriate, or otherwise violate the Intellectual Property rights of any third party.  Neither Party shall agree to any settlement of a Claim without the consent of the other Party, which consent shall not be unreasonably withheld or delayed and any such settlement shall contain an unconditional release of both the Licensor Indemnified Parties and the Licensee Indemnified Parties.

5.3     Relation to Purchase Agreement. To the extent any of Licensor's indemnity obligations under this Article 5 with respect to a Claim overlap with those available to the Licensee or Purchaser under the Purchase Agreement (including under any insurance policy), Licensee or Purchaser shall first seek indemnity under the Purchase Agreement (including under any insurance policy) for the applicable Claim and shall exhaust their rights thereunder prior to seeking indemnity under this Article 5 for such Claim. For clarity, the foregoing does not apply to any Claim that would be subject to an indemnification obligation under this Agreement but not under the Purchase Agreement.  Licensee shall use its commercially reasonable efforts to pursue and collect on any recovery available under any insurance policies (including the R&W Policy).  The amount of Losses payable under this Agreement by any Licensor Indemnifying Party shall be reduced by any and all amounts recovered by the Licensee Indemnified Party under applicable insurance policies or from any other Person alleged to be responsible therefor (net of reasonable out of pocket expenses incurred in obtaining such recovery and the amount of any retrospective or other current increase in insurance premiums solely attributable to the payment of such cash recovery).  If the Licensee Indemnified Party receives any amounts under applicable insurance policies or from any other Person alleged to be responsible for any Losses, subsequent to an indemnification payment by Licensor, then such Licensee Indemnified Party shall promptly reimburse Licensor for any payment made or expense incurred by Licensor in connection with providing such indemnification up to the amount received by Licensee, net of any expenses incurred by such Indemnitee in collecting such amount and the amount of any retrospective or other current increase in insurance premiums solely attributable to the payment of such cash recovery.

5.4     Limitation of Liability.

(i)     EXCEPT WITH RESPECT TO: (I) LICENSEE'S OBLIGATION TO REMIT LICENSE FEES DUE UNDER THIS AGREEMENT; (II) EITHER PARTY'S

BREACH OF ARTICLE 7 (CONFIDENTIALITY); OR (III) EITHER PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH IN THIS ARTICLE 5, UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY IN CONNECTION WITH THIS AGREEMENT FOR CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE OR INCIDENTAL DAMAGES OR LOST PROFITS, WHETHER FORESEEABLE OR UNFORESEEABLE (INCLUDING CLAIMS FOR LOSS OF GOODWILL, USE OF OR RELIANCE ON THE SOFTWARE LICENSED HEREUNDER, STOPPAGE OF OTHER WORK OR IMPAIRMENT OF OTHER ASSETS), ARISING OUT OF BREACH OR FAILURE OF EXPRESS OR IMPLIED WARRANTY, BREACH OF CONTRACT, MISREPRESENTATION, NEGLIGENCE, OR ANY OTHER LEGAL OR EQUITABLE THEORY.

(ii)   NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, EXCEPT WITH RESPECT TO: (I) LICENSEE'S OBLIGATION TO REMIT LICENSE FEES DUE UNDER THIS AGREEMENT OR (II) EITHER PARTY'S BREACH OF ARTICLE 7 (CONFIDENTIALITY), THE AGGREGATE LIABILITY OF EITHER PARTY HEREUNDER OR IN CONNECTION HEREWITH, WHETHER IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, SHALL NOT EXCEED $1,000,000.

## Article VI
## CONFIDENTIALITY

6.1   Confidentiality Obligations. At all times during the Term and for a period of three (3) years thereafter (except with respect to trade secrets of a Party, including source code, in which case the obligation shall survive for so long the trade secret is maintained as such under applicable Law), each Party shall, and shall cause its Affiliates, and its and their current and former respective officers, directors, employees and agents (collectively, such Receiving Party's "Representatives") to, keep completely confidential and not publish or otherwise disclose the other Party's Confidential Information, except to the extent such disclosure or use is expressly permitted by the terms of this Agreement or such use is reasonably necessary for the performance of the Receiving Party's obligations, or the exercise by the Receiving Party of its rights, under this Agreement. Each Receiving Party shall (and shall cause its Representatives to) take reasonable actions to protect against any disclosure of the Confidential Information of the Disclosing Party (and shall use no less than a reasonable degree of care) except as expressly permitted under this Article VI.

6.2   Confidential Information. The term "Confidential Information" means any and all technical or commercial information disclosed to, or learned by, a party in connection with this Agreement (the "Receiving Party") that is confidential or proprietary to the other Party (the "Disclosing Party") including customer information and lists, business plans, forecasts, financial data and analyses, documents, project plans, spreadsheets, software, documentation, systems information, prototypes, product samples, drawings, databases, e-mail messages, systems configuration information, models, apparatus, sketches, designs and lists, and all other information that, by its nature, should reasonably be considered confidential or proprietary. Notwithstanding the foregoing, Confidential Information shall not include any information that: (i) is or hereafter becomes part of the public domain by public use, publication, general

knowledge or the like through no wrongful act, fault, or negligence on the part of Receiving Party or its Representatives; (ii) can be demonstrated by documentation or other competent proof to have been in the Receiving Party's possession prior to disclosure by or on behalf of the Disclosing Party without any obligation of confidentiality with respect to said information; provided, however, that the foregoing exception shall not apply where Licensor is Receiving Party with respect to Confidential Information of the Business in Licensor's possession prior to the Effective Date; (iii) is subsequently received by the Receiving Party from a third party who is not bound by any obligation of confidentiality with respect to said information; or (iv) can be demonstrated by documentation or other competent evidence to have been independently developed by or for the Receiving Party without reference to the Disclosing Party's Confidential Information.

6.3     Permitted Disclosures. Each Receiving Party may disclose Confidential Information disclosed to it by the Disclosing Party to the extent that such disclosure by the Receiving Party is: (i) required by applicable Law; provided, however, that the Receiving Party, where reasonably possible, shall first have given notice to the Disclosing Party and give the Disclosing Party a reasonable opportunity to quash such order or obtain a protective order requiring that the Confidential Information and documents that are the subject of such order be held in confidence; and provided further that if a disclosure order is not quashed or a protective order is not obtained, the Confidential Information disclosed in response to such court or governmental order shall be limited to the information that is legally required to be disclosed in response to such court or governmental order; (ii) made by the Receiving Party or its Representative to its attorneys, auditors, advisors, consultants, contractors, licensees or other third parties in connection with the performance of its obligations or exercise of its rights as contemplated by this Agreement; provided, however, that such individuals or entities shall be subject to obligations of confidentiality substantially similar to the Receiving Party's obligations hereunder; or (iii) made by the Receiving Party or its Representative to actual or prospective acquirers, merger candidates, financing sources, or investors (and to their respective Affiliates, representatives, and financing sources); provided that each such third party signs an agreement that contains obligations of confidentiality substantially similar to the Receiving Party's obligations hereunder.

Article VII<br>GENERAL

7.1     Independent Contractor. The relationship of Licensor and Licensee established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to: (i) give either Party the power to direct and control the day-to-day activities of the other; (ii) constitute the Parties as franchisee/franchisor, partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking; or (iii) allow either Party to bind the other Party in any manner or otherwise create or assume any obligation on behalf of such other Party for any purpose whatsoever. Neither Party is an agent of the other Party.

7.2     Notices. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if (i) delivered personally against written receipt, (ii) sent by facsimile transmission or email, (iii) mailed by registered or certified mail, postage prepaid, return receipt requested, or (iv) mailed by reputable international

overnight courier, fee prepaid, to the Parties hereto at the following addresses, emails or facsimile numbers:

    if to Licensor:

        c/o NCS Pearson Inc.
        330 Hudson Street, 9th floor
        New York, NY 10013
        Attention: General Counsel
        Email: bjarne.tellmann@pearson.com

    With a copy to:

        Morgan, Lewis & Bockius LLP
        101 Park Avenue
        New York, NY 10178
        Attention: Robert W. Dickey
        Facsimile: (212) 309-6001
        Email: robert.dickey@morganlewis.com

    if to Licensee:

        c/o Nexus Capital Management LP
        11100 Santa Monica Blvd, Suite 250
        Los Angeles, CA 90025
        Attn: Damian J. Giangiacomo
        E-mail: damian@nexuslp.com

    With a copy to:

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, NY 10022
        Attention:  Douglas Ryder, P.C.
                       Michael Sartor
        Email:       douglas.ryder@kirkland.com
                       michael.sartor@kirkland.com

All such notices, requests and other communications will be deemed given, (w) if delivered personally as provided in this Section 7.2, upon delivery, (x) if delivered by facsimile transmission or email as provided in this Section 7.2, upon confirmed receipt, (y) if delivered by mail as provided in this Section 7.2, upon the earlier of the fifth Business Day following mailing and receipt, and (z) if delivered by overnight courier as provided in this Section 7.2, upon the earlier of the second Business Day following the date sent by such overnight courier and receipt (in each case regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice is to be delivered pursuant to this Section 7.2).

DB1/ 103122374.1

Any Party hereto may change the address to which notices, requests and other communications hereunder are to be delivered by giving the other Parties hereto notice in the manner set forth herein.

7.3     Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless such amendment is in writing and signed by Licensor and Licensee.  No waiver of any right under this Agreement shall be valid unless in writing and signed by the Party waiving such right.  No waiver shall be implied from any course of dealing between the Parties hereto. No failure or delay by any Party hereto in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or constitute a continuing waiver of any subsequent event or breach or the exercise of any other right, power or privilege.

7.4     Expenses.  Except as otherwise provided herein, each Party hereto shall bear its own costs and expenses in connection with this Agreement and the transactions contemplated hereby, including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties

7.5     Assignment and Delegation. This Agreement shall inure to the benefit of, and be binding on, the Parties and their respective successors and permitted assigns. Except as expressly set forth in this Agreement, neither Party may assign or otherwise transfer, in whole or in part, this Agreement or its rights or obligations hereunder without the written consent of the other Party; provided, however, that without such consent either Party may: (i) assign or otherwise transfer this Agreement in connection with the sale of at least a majority of its assets to which this Agreement relates or at least a majority of its equity, or to any successor corporation resulting from any merger, reorganization, combination, or consolidation; and (ii) assign or otherwise transfer, in whole or in part, this Agreement or its rights or obligations hereunder, to an Affiliate, provided that such Party shall remain responsible and liable for the performance by such Affiliate of its obligations hereunder. Each Party shall notify the other Party as soon as commercially practicable in the event such first Party assigns this Agreement in accordance with clause (a) or clause (b) of this Section 7.5. Any purported assignment or transfer in violation of this Section 7.5 shall be void.

7.6     Governing Law. All matters relating to or arising out of this Agreement or the transactions contemplated hereby (whether sounding in contract, tort or otherwise), including the interpretation hereof and any dispute in connection herewith, will be governed by and construed in accordance with the Laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule of any jurisdiction that would cause the application of the Laws of any jurisdiction other than the State of New York.

7.7     Consent to Jurisdiction; Waiver of Jury Trial. Each Party hereto irrevocably submits to the exclusive jurisdiction of any state or Federal court located within the County of New York in the State of New York for the purposes of any Action arising out of this Agreement or any transaction contemplated hereby, and agrees to commence any such Action only in such courts.  Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth herein shall be effective service of process for any such Action.  Each Party irrevocably and unconditionally waives any

objection to the laying of venue of any Action arising out of this Agreement or the transactions contemplated hereby in such courts, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

  7.8 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile, email or other electronic transfer shall be effective as delivery of a manually executed counterpart to this Agreement.

  7.9 <u>Third Party Beneficiaries</u>. No provision of this Agreement is intended or shall be deemed to confer upon any Person other than the Parties hereto any rights or remedies hereunder, except for the Licensor Indemnified Parties and the Licensee Indemnified Parties.

  7.10 <u>Entire Agreement</u>. This Agreement (including the Exhibits hereto) and, for purposes of Section 5.3, the Purchase Agreement (including any related insurance policy), constitutes the entire agreement between the Parties hereto with respect to the subject matter hereof and supersedes any prior understandings, agreements or representations by or between the Parties hereto, written or oral, with respect to such subject matter. All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

  7.11 <u>Captions</u>. All captions contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

  7.12 <u>Interpretation</u>.  The Parties hereto have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof

  7.13 <u>Construction</u>. For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other gender; (ii) references herein to "Articles," "Sections," "subsections" and other subdivisions, and to Exhibits, without reference to a document are to the specified Articles, Sections, subsections and other subdivisions of, and Exhibits to, this Agreement; (iii) a reference to a subsection or other subdivision without further reference to a Section is a reference to such subsection or subdivision as contained in the same Section in which the reference appears; (iv) the words "herein", "hereof", "hereunder", "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(v) the words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation"; (vi) any accounting terms used and not defined herein have the respective meanings given to them under GAAP; and (vii) if used, the phrases "ordinary course", "ordinary course of business" and "ordinary course of business consistent with past practice" all mean, with respect to any Person, the usual and ordinary course of such Person's business consistent with past practice (including with respect to nature, scope and magnitude).

7.14     Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any Party hereto under this Agreement will not be materially and adversely affected thereby, (i) such provision will be fully severable, (ii) this Agreement will be construed and enforced as if such provision had never comprised a part hereof, (iii) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by such provision or its severance herefrom and (iv) in lieu of such provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such provision as may be possible.

7.15     Remedies. The rights and remedies of the Parties will be cumulative (and not alternative). No provision of this Agreement shall be construed to provide an indemnity or other recovery for any costs, damages, or other amounts for which the damaged party has been compensated under any other provision of this Agreement or under any other Transaction Documents or action at law or equity, such that there will be no double-recovery of any loss under or among the Transaction Documents. Except as set forth in Section 5.3, a Party shall not be required to exhaust all remedies available under the other Transaction Documents or at law or equity before recovering under the remedies provided in this Agreement. As used herein, "Transaction Document(s)" means, individually or collectively as the context requires: (i) this Agreement; (ii) all other Ancillary Agreements; and (iii) the Purchase Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

NCS PEARSON, INC.

By: _____

Name: Andrew Siclari
Title: Vice President


PEARSON K12 LEARNING LLC

By: _____

Name: Bethlam Forsa
Title: President

*[Signature Page to Software License Agreement (Term)]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

**NCS PEARSON, INC.**

By: _____
Name: Andrew Siclari
Title: Vice President


**PEARSON K12 LEARNING LLC**

By: _____*BForsa*_____
Name:   Bethlam Forsa
Title:   President

*[Signature Page to Software License Agreement (Term)]*

## **Exhibit A**
## Software

<u>Software Licensed to the Licensee</u>. The Licensor shall license the following Software to the Licensee pursuant to <u>Section 1.1</u> of this Agreement:

- TestNav 8 Previewer v1.5.000 solely for use in the Realize platform and PSoC platform in a manner substantially consistent with how such software is deployed on the Effective Date as an embedded and integrated component of the curriculum applications on such platforms. For the avoidance of doubt, Licensee shall not be permitted to use, distribute, or sublicense TestNav 8 Previewer V.15.000 apart from the Realize Curriculum applications in which it is embedded or as a stand alone assessment application or to otherwise deliver stand alone assessment functionality .
- SchoolNet v15.4 solely for use in the PSOC platform in a manner substantially consistent with how such software is deployed on the Effective Date, as an embedded and integrated component of the curriculum applications on such platforms solely for the purpose of student authentication and storage of student data (i.e., not as a standalone software application).

DB1/ 103122374.1